1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD ANTHONY BREWER,

11          Petitioner,                    No. CIV S-06-0382 GEB GGH P

12      vs.

13   D.L. RUNNELS, Warden, et al.,

14          Respondents.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   *Introduction and Summary*

17          After years of adjudication, this habeas case is ready for resolution.  The only

18   issue remaining at this juncture concerns petitioner's absence from a hearing related to

19   disciplinary allegations asserted against his lawyer by the Public Defenders office, who employed

20   counsel at the time.  Specifically, as set forth in the Order setting the evidentiary hearing in this

21   case:

22          Characterizing the basic issue here is difficult in that the alleged error involves an
             inextricable blending of petitioner's absence from proceedings in which an actual
23           or potential conflict of counsel was discussed, possible errant advice from his
             attorney regarding a conflict, and a decision by petitioner to waive a potential
24           conflict of counsel on less than a full disclosure of facts.

25          In a sentence, the backdrop of the issues here revolve about trial counsel's
             unethical conduct with another unrelated defendant, and the possible effect in
26           petitioner's case of pending disciplinary proceedings against her along with the

                                              1

potential effect of embarrassing publicity, and petitioner's absence from an in camera hearing in which the issues were discussed. A violation of ethics law for counsel does not create an actual conflict *per se*. See United States v. Nickerson, 556 F.3d 1014, 1019 (9th Cir. 2009). However, in certain circumstances, an actual conflict could arise, and petitioner had to make a choice at this time of whether to continue with his counsel or accept another appointed counsel. In making this choice, petitioner had to be sufficiently informed about the nature of counsel's wrongdoing, *either* by counsel or the court.

The crux of the problem here initially involves intelligent waiver of the potential conflict, and that determination involves the totality of whether counsel effectively advised petitioner about the nature of the potential conflict, the prejudice suffered from not being permitted to attend a hearing where a fuller discussion of the ethical problem took place, and the discussion by the judge in open court about the nature of the conflict along with his inquiry to petitioner of whether petitioner desired to waive the conflict.

If the waiver of any conflict was valid, the petition should be denied as petitioner has abandoned any subsequent issues, related or not, to the issue of conflict of counsel. If the waiver is found not to be valid, it is not "game over" for respondent; the law requires a determination to then be made whether the potential conflict advanced to an actual conflict which caused an "adverse effect" on counsel's performance, and if not, whether petitioner suffered Strickland[1] prejudice as a result of any lingering potential conflict. See Belmontes v. Brown, 414 F.3d 1094, 1118 (9th Cir. 2005), *rvs'd on other grounds*, Ayers v. Belmontes, 549 U.S. 7, 127 S.Ct. 469 (2006); Lewis v. Mayle, 391 F.3d 996, 997 (9th Cir. 2004), in which both cases found a conflict waiver invalid and then went on to determine whether the effect of the conflict warranted reversal.[2]

After an exhaustive presentation of the facts, the undersigned will first discuss whether, aside from any advice counsel may have given her client about the nature of the conflict, the record allows a finding that petitioner was sufficiently informed such that he could validly waive any conflict. If the record does not permit such a finding, the court will determine whether an evidentiary hearing is permitted to ascertain what *specifically* counsel told her client about the nature of the conflict. These facts, could, depending on their specificity, make up for any deficiencies in the on-the-record explanations to petitioner.

Assuming for the moment, that the undersigned ultimately finds a non-intelligent waiver, the effect of that deficiency would have to later be assessed viewing the case as a whole, either on the "adverse effect" standard, or Strickland prejudice.

Evidentiary Hearing Order, November 24, 2009 at 4-5.

---

[1] Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

[2] Even if an actual conflict were found to have ripened, petitioner must show that the conflict adversely affected some part of counsel's performance in terms of preparation or conduct of the trial. Foote v. Del Papa 492 F.3d 1026, 1029-30 (9th Cir. 2007).

An evidentiary hearing was held concerning what was told to petitioner by his counsel, as what petitioner knew, and when he knew it, are important factual matters.  This Findings and Recommendations will borrow liberally from previous orders in this case, as an order simply recounting the decision after hearing would leave the reader in the dark about the circumstance of the entire case.  And, it is grossly inefficient to have a reviewer sift through the docket attempting to get a picture of the case as a whole.

In sum, the undesigned recommends that the petition be denied.  Petitioner sufficiently knew the *in camera* hearing facts at the time he made his waiver, and, in any event, he suffered no prejudice from any potential or actual conflict.

*Factual History*

The Third District Court of Appeal in an unpublished opinion, noted that the trial, involving four defendants, four defense counsel, two prosecutors and three juries, "was long and complicated."  People v. Brewer, 2005 WL 290021 *1 (Cal. App.3rd 2005).  The "facts of the crimes," are not presently at issue in this order.  Suffice it to say here that the case involved serial robberies of the Bread Store by multiple assailants.  Brewer was involved in both robberies, and the last robbery resulted in the murder of a Bread Store employee.

*Procedural History*

Petitioner filed his initial federal petition on February 26, 2006.  He listed nine claims (1-8 specifically enumerated, and claim 9 was a cumulative error claim made in the conclusion):

1. Trial court error in not granting the Sacramento County Public Defender's (PD) Motion to Withdraw from Representation;

2. Failure of the trial court to fully disclose his counsel's conflicts by virtue of petitioner's absence from an *in camera* hearing in which the conflicts were specifically discussed thereby resulting in an uninformed waiver;

3. Marsden motion (conflict with counsel) denials;

4. Counsel's preclusion from use of the pass-through window at the jail resulted in a compelled

choice between self-incrimination and right to counsel;

5. Outrageous government conduct in monitoring attorney-client visits;

6. Involuntary consent to search;

7. Prejudicial statements by jurors;

8. Due process violation in admission of photographs;

9. Cumulative Error .

In his amended petition filed on December 12, 2007, petitioner expressly

abandoned every claim except for number 2.  Thus, only that claim, dual as it is with both an

absence from hearing and uninformed waiver aspect, will be adjudicated herein.

Within that claim, however, petitioner abandoned arguments and later attempted

to retract the abandonment.  Some explanation is necessary as petitioner has thrashed about

searching for a prejudice argument that will work for him.

Petitioner initially contended that he does not make any argument based on the

Sixth Amendment because in order to prevail on such a claim it would be necessary for petitioner

to demonstrate that the conflict adversely affected his defense counsel's performance and while

"Repkow's performance was affected in regards to her relationship to her client...." as evidenced

by the multiple Marsden[3] motions, the prejudice standard for a conflict issue relates to how the

trial legal issues were actually handled and petitioner conceded "that an adequate showing of this

type of 'adverse effect' cannot not be made in this case."  FAP, pp. 33-34; Mickens v. Taylor,

535 U.S. 162, 174, 122 S. Ct. 1237, 1245 (2002) (where trial court fails to inquire into a potential

conflict of interest about which it knew or reasonably should have known, petitioner has the

burden "to establish that the conflict of interest adversely affected his counsel's performance" in

---

[3] In People v. Marsden, 2 Cal. 3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970), the California Supreme Court held that a trial court must permit a defendant seeking a substitution of counsel after the commencement of the prosecution's case to specify the reasons for his request.

order to show a Sixth Amendment violation); <u>Campbell v. Rice</u> (<u>Campbell</u> II), 408 F.3d 1166, 1170-71 (9th Cir. 2005) (en banc) (no relief from Sixth Amendment violation unless defendant can demonstrate counsel's "performance was 'adversely affected' by the conflict of interest").[4]

Thus, as articulated in his first amended petition, petitioner's claim rests on an assertion of a Fourteenth Amendment due process violation by the trial court "in absenting Brewer from a crucial proceeding," as well as allegedly subsequently failing to fully disclose the facts divulged at that proceeding. FAP, pp. 34 - 44. Petitioner asserted that <u>Campbell II</u> is incorrect, and structural error should be found; he also asserted that the attorney-client relationship was substantially harmed by the absence and invalid waiver, i.e., he should have been allowed to fully assess the potential damage to the relationship at the time of waiver of potential conflict.

Notwithstanding, in his traverse while remaining focused on a claim of a due process violation, petitioner expressly withdrew his previous analysis predicated on <u>Campbell</u> II, as well as withdrawing his prior withdrawal of any Sixth Amendment argument. Traverse, p. 7. Eschewing his prior express averment that the requisite prejudice for a Sixth Amendment violation could not be shown, petitioner asserts in the traverse that "[t]he key issue here is prejudice" for which he maintains that the "controlling authority" is <u>Bradley v. Henry</u>, 510 F.3d

---

[4] In the earliest incarnation of <u>Campbell v. Rice</u> , 265 F.3d 878 (9th Cir. 2001), subsequently withdrawn and superseded, a Ninth Circuit panel concluded that the failure of the trial court, on notice of a potential conflict of interest, in not conducting an appropriate inquiry, resulted in a constitutional violation that amounted to structural error, requiring reversal of the conviction. Petitioner embraces the superseding decision of <u>Campbell v. Rice</u> (denominated by petitioner as <u>Campbell</u> I), 302 F.3d 892, 899-900 (9th Cir. 2002), wherein the same panel revisited the original decision following the Supreme Court's ruling in <u>Mickens</u>, <u>supra</u>, 535 U.S. 162, 122 S. Ct. 1237 (2002), this time affirming the district court's denial of petitioner's conflict of interest claim (based on petitioner's not having shown that the conflict adversely affected her performance), but holding that petitioner's due process rights were violated due to his exclusion from an in-chambers hearing during which his counsel's potential conflict of interest was discussed, finding this to be structural error and reversing the district court's denial of the habeas petition on that ground. The en banc decision which followed, cited above, ultimately affirmed the district court's denial of the petition in its entirety, a holding with which petitioner herein vehemently takes issue, while conceding that the decision is binding on this court. FAP, pp. 43-44.

1  1093 (9th Cir. 2007) (en banc), contending that the "harmful to the attorney-client relationship"

2  prejudice analysis therein is what he relies on at this point.[5]

3        On February 29, 2008, the following addition in <u>Bradley v. Henry</u>, cited as 518

4  F.3d 657, issued, stating in relevant part: "The plurality opinion has been joined by only five of

5  the eleven judges on this limited en banc panel.  Because that constitutes less than a majority of

6  the panel, that opinion does not announce the law of this circuit.  The precedential effect of this

7  decision does not extend beyond the conclusions expressed in this separate opinion [referencing

8  the decision at 510 F.3d 1093], which concurs in the judgment on more narrow grounds. [citation

9  omitted]."[6]  To the extent that petitioner makes an argument in his traverse based on the Sixth

10  Amendment – despite having expressly previously avowed that the requisite prejudice to support

11  a claim of ineffective assistance of counsel under the Sixth Amendment could not be shown as to

12  the actual handling of the legal issues at trial – rather than limiting his claim to a Fourteenth

13  Amendment due process violation as set forth in the amended petition, the court will include that

14  discussion below.  However, as discussed below, petitioner incorrectly relies on the <u>Bradley</u>

15  plurality opinion, and petitioner's inability to even show an adverse effect on the trial itself,

16  much less <u>Strickland</u> prejudice is ultimately the downfall of this petition.

17  *AEDPA Standards*

18        These standards are well known and were set forth in the initial order.  For sake of

19  brevity, they will be omitted here.

20  \\\\\

21

22     [5] The Ninth Circuit's en banc decision in <u>Bradley v. Henry</u>, 510 F.3d 1093 (9th Cir. 2007),
was filed a week after petitioner filed the first amended petition (FAP) herein.  Petitioner in

23  Footnote 4 of the FAP, referenced a case he noted to be "previously citable as <u>Bradley v. Henry</u>,
428 F.3d 811 (9th Cir. 2005)," in which he indicated at the time of the filing of the instant

24  amended petition, on December 12, 2007, was scheduled for en banc review.  The en banc
decision was filed on December 19, 2007.

25

26     [6]  The more narrow grounds were simply that unwarranted denial of one's choice of
counsel was structural error.

*Discussion*

In order to be complete in this document, much of what was set forth in the order for evidentiary hearing, is set forth here.  That discussion is critical to understand why the undersigned found AEDPA-unreasonable the analysis of the Court of Appeal finding a valid waiver of potential conflict on the record before it.  The undersigned will then discuss the evidentiary hearing issue – whether petitioner had knowledge of the substance of the in-chambers conference from his counsel such that an absence from the *in camera* hearing was factually harmless.  Finally, if the absence was not harmless, was petitioner sufficiently prejudiced to warrant a granting of the petition.

    1.  Lead Up to the Evidentiary Hearing

        Factual Background re: Petitioner's Representation

The facts concerning this claim, which would test any trial judge, must be initially fully stated, and then broken out in order to fully understand the claim.  The 3rd DCA sets forth the following background "facts concerning Brewer's representation:"

> The public defender's office was appointed to represent Brewer on January 16, 1997.  Brewer was represented by assistant Public Defender Karol Repkow, a 22-year veteran of the Public Defender's Office. Trial began November 1, 2000. The first weeks were taken up with pre-trial motions, then jury selection for three juries. Opening statements were presented to Brewer's jury and the first witness was called on March 20, 2001 (trial day 46). The court excused the jury until Monday, April 2.

> On March 29, 2001, Repkow approached all counsel and told them she needed to speak to the court ex parte; there was no objection. Repkow asked the court for a one-week continuance until April 9. She was involved in a situation involving her employment that was taking substantially all of her time. The next day, Friday, the trial court held a hearing. Repkow did not attend due to "the personal issue," but her supervisor, Don Manning, attended. Manning told the court he believed that with a one-week continuance Repkow would be able to represent Brewer the remainder of the trial. The prosecutor's only concern was what had been disclosed to Brewer and his attitude about the matter. The court envisioned a two-part process: the first step was the continuance, then a further hearing with Repkow and Brewer so "that everyone is on the same page." The court granted the continuance without objection.

That afternoon the court had a conversation with Paulino Duran, the public defender, about whether there would be any further disruptions in this case relative to this situation. Duran assured the court that to his knowledge there would be none.

The following Monday, April 2, Manning appeared with Repkow and stated the public defender's office was declaring a legal conflict. Two defense counsel who represented another client who may have been involved in the potential conflict were present. They were concerned with protecting their client's privileges. A hearing was held in the afternoon.

Manning stated that based on a reevaluation of the case and subsequent matters, the public defender's office believed it was best to ask to be relieved because they did not believe Brewer could get effective assistance of counsel if the office remained in the case. The evaluation was based on facts surrounding Repkow's representation and other factors in her life. Manning was not prepared to discuss those further unless the court asked for an in camera hearing.

The court indicated it needed a better idea of the nature of the conflict. Repkow stated her primary concern was what was best for Brewer and he wanted her to continue to represent him. She believed she was ready and able to do that. She suggested the conflict was between her office and herself and was not a legal conflict that touched on Brewer. Manning asserted that Repkow was not in a position to raise the issue of conflict because the public defender was the attorney of record and the public defender believed Repkow could not provide effective assistance of counsel. Additionally, Manning advised the court that Repkow intended to request an additional one-week continuance.

The court granted an in camera hearing; present were two representatives from the public defender's office, Manning and Mr. Loehr, Repkow, and Brewer. The court indicated the situation did not permit simply allowing the Public Defender's Office to make the call because Brewer had certain rights to continue representation by Repkow.  Presumably, the trial court was referring to *Harris v. Superior Court* (1977) 19 Cal.3d 786. Under *Harris*, a trial court exercising its discretion in the appointment of counsel should take into consideration whether defendant has a preexisting relationship with an attorney willing to accept appointment. ( *Id*. at p. 799.) But even in such circumstances, the court need not appoint that attorney when there are "countervailing considerations of comparative weight." ( *Ibid*.)

Manning discussed what precipitated the withdrawal motion. He reported that after the request for the continuance the previous Thursday, Repkow was to meet with Duran, but she was so distraught she was unable to, nor was she able to attend court on

Friday. The public defender's office questioned Repkow's judgment regarding her conduct with another client. They could not guarantee the court Repkow might not have an emotional collapse in the future; they could not certify that Repkow could adequately and effectively assist Brewer. Loehr added that the facts revealed "a failure to exercise good legal judgment, failure to understand [her] role as counsel and perhaps a failure to be able to focus and to do the work in this matter that is required because of other concerns." There was also a concern that personnel matters would be preceding [sic] simultaneously with the case and a high likelihood of adverse publicity shortly. There had been serious lapses of judgment involving her contact with a prior client as to whom the Public Defender's Office had declared a legal conflict. Repkow took the position these matters did not effect [sic] Brewer. The court confirmed with Brewer that he wanted Repkow to continue to represent him. Manning declared Brewer could not waive the issue of effective assistance of counsel.

The discussion turned to the timing of the personnel issues facing Repkow. Manning told the court that he was investigating the matter and would have a report to Duran in 30 days. Any further action would be taken in less than six months, while the trial was going on. Manning stated the previous one-week delay was due to the impact of Repkow understanding the office was initiating an action against her; the personnel matter would not be resolved in a week, but before this trial was over.

Manning set forth his office's position of the issue of effective assistance of counsel: "It is our belief based on internal personnel matters, matters that have come to our attention through information that has been provided to us by the Sheriff's Department, information that has been presented to Ms. Repkow in the form of a letter by Mr. Duran, her conduct last week and on Friday, her conduct with a prior client, her conduct with other prior clients in our office, that we believe that if that hits the public during this trial that we cannot guarantee this Court that Ms. Repkow will be able to assist effectively in insuring that Mr. Brewer has the proper right to counsel." Manning indicated Repkow was concerned about termination from the office and public disclosure of the events that led to the investigation.

Repkow protested she felt the Public Defender's Office was pressuring her to change her position by threatening to fire her within 30 days. The court remarked the only thing that sounded new from the previous week was that this matter might become public.

The trial court determined more information on the personnel matter was necessary, so Brewer was removed from the hearing. Manning explained that in January the public defender's office had to declare a conflict as to a client and Repkow was ordered to have

no contact with that client. In early March, law enforcement advised them that Repkow had continuing contact with that client and law enforcement was revoking her privilege to use the attorney-client room. Repkow had also received calls from the client at both her home and office. And Repkow had been passing contraband to the client and violating rules of the sheriff's department concerning social visits, contraband, and using other inmates to communicate with the client. Duran directed her in writing not to have any additional contact with the client, and the previous Friday Repkow disregarded that order and received a phone call from that client. The public defender's office then reassessed Repkow's judgment and how the circumstances of her contact with the client, the pending personnel matter, and other things would weigh on her ability to represent Brewer. The conclusion was the office could not assure the court of adequate representation. Loehr added there was some question whether Repkow properly understood the role of counsel.

Repkow reiterated that any mistakes she had made had no bearing on Brewer and she believed she could adequately represent him. The court adjourned the hearing until the next day.

The next day, to refute any claim of ineffective assistance of counsel, Repkow recounted all the work she had done on this case. She then proposed that she would resign from the public defender's office and ask the court to appoint her to represent Brewer.

The court found there was no current conflict of interest, though there was a secondary issue of a potential conflict of interest. The court had not found any ineffective assistance on the part of Repkow so far in the trial. The court then questioned Brewer. Brewer said he did not understand most of what had been discussed, but he wanted Repkow to represent him. The court then explained that the public defender's office wanted to be relieved because it believed Repkow could not effectively represent him. There were issues involving her employment that might distract her and affect her ability to be focused on this case; her attention could be divided. As a result, it might increase his chance of being convicted. Brewer was given the opportunity to discuss the potential conflict with an attorney from the indigent defense panel but declined. Brewer stated he had discussed the matter with Repkow and was comfortable with his decision to retain her.

The court found Brewer had been advised of the right to be represented by conflict-free counsel and understood the disadvantages of being represented by an attorney with a potential conflict. He had discussed the matter with his attorney and was aware of the possible consequences. The court found Brewer waived any potential conflict, stressing that the conflict was only potential.

Repkow requested a week's continuance as she needed to move her office. The request was granted.  Repkow resigned from the public defender's office. The public defender requested a five-month continuance for a new lawyer to take over the case.  Repkow requested she be appointed Brewer's counsel. Brewer indicated he wanted Repkow to represent him. The trial court relieved the public defender's office as counsel and appointed Repkow to represent Brewer.

Beginning two months later, Brewer made a series of *Marsden* (*People v. Marsden* (1970) 3 Cal.3d 118) motions.  At one point he sought to represent himself.  (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].)  Brewer and Repkow also complained that Repkow was denied pass-through privileges in the attorney-client area of the jail and the lack of privacy made communication on Brewer's defense extremely difficult. All of these motions were denied as the court found Repkow provided effective assistance of counsel.

Brewer, supra, 2005 WL 290021 *5-8.

Petitioner contends that in obtaining the waiver from petitioner, the court did not disclose to him:

(1) Repkow had a personal relationship with another client, (2) was barred from using the attorney-client room (pass through window), (3) that her telephone calls were being intercepted, or (4) that the Public Defender's office had serious doubts about her competency based upon other matters that they had reviewed.

FAP P&A, p. 24, citing RT 2202-2206.

These issues arose in a case involving four co-defendants (and multiple juries) during the six months of trial.  RT 2151-2152.  Repkow asked for the in camera hearing to be comprised of the court, herself and petitioner.  RT 2152.  The trial judge ordered the in camera hearing among himself, Ms. Repkow, petitioner, as well as Mr. Manning and Mr. Loehr of the Office of the Public Defender, including "necessary court staff."  RT 2152-2153; initially sealed RT 2154-2196 (Docket # 59) (unsealed in evidentiary hearing order).

At first, Ms. Repkow objected to Mr. Manning's and Mr. Loehr's presence as adverse to herself and thus, to her client, and just wanted the judge, herself and petitioner at the hearing.  RT 2154.  But the judge noted it was the Office of the Public Defender (OPD) which

1  was petitioner's appointed counsel and that the assignment to a particular attorney occurred

2  within the office, so as petitioner's counsel, the OPD could be heard.  RT 2154-55.  The judge

3  observed that petitioner was "in the middle" of any conflict between the OPD and Repkow, and

4  that in order to make a waiver if that should come up, petitioner needed to be present to "know

5  all the dynamics that are involved in this particular case."  RT 2155.  Although Ms. Repkow

6  continued to object to the OPD arguing against her in front of petitioner, the judge asked how

7  petitioner could "make an informed decision without having all of the facts available to him[.]"

8  RT 2156.  The judge also referred both to his need and that of petitioner to hear about the conflict

9  issue "if it's this bad now."  RT 2157.  Ms. Repkow said the following about what she had

10  previously shared with petitioner:

11           "*I have indicated to Mr. Brewer generally the nature of my*
            *position* with respect to the office and that some matters have
12          arisen that actually concern, as an example, or may concern a
            former client.  The conflict in my view had nothing to do with Mr.
13          Brewer.  I think I've already said that and doesn't have a bearing
            on my representation of him.
14
            Mr. Brewer is aware that, obviously he can see there's a conflict
15          here in my own office, and that much I did represent to him.  And
            as I've already indicated to the Court, Mr. Brewer states that he
16          wants to continue with me as his attorney, what he understands that
            some matters have arisen in my office, matters that concern me,
17          matters that concern other individuals and other issues that have
            taken my focus away recently within the last few days from his
18          case, which is why I asked for an additional week."

19  RT 2157-58. (Emphasis added)

20  Her focus at that point was on the unnamed former client and she wanted to make sure counsel

21  for that client be included if Mr. Manning and Mr. Loehr intended to discuss that former client.

22  RT 2158.  Petitioner was present for a discussion of how Repkow had been unable to

23  communicate with the public defender, Paulino Duran, and that Manning had come to court on

24  Friday for Repkow because she was so distraught and there was a personnel issue that was in the

25  investigation phase.  RT 2159.

26           Mr. Manning: "We currently question her judgment based on the

12

issues that are involved in the personnel matter.  We question her judgment regarding her conduct with another client in our office.  And after a full and thorough discussion of whether or not we believe that she could provide effective assistance of counsel to Mr. Brewer, it was our judgment that she could not.  And that's why we have requested our office to be relieved."  RT 2159-60.

We cannot guarantee to the Court that two weeks from now, three weeks from now she is not going to have an emotional collapse, and I don't think the Court wants to be in that situation three to four weeks from now.  She's had this case for four years, and her emotional state last week was such that she requested the Court to continue it a week, and this morning wanted the Court to continue it an additional week.

We cannot certify that Ms. Repkow can adequately and effectively assist Mr. Brewer."  RT 2160.

Mr. Loehr: "[W]e have a responsibility as an office to make sure that Mr. Brewer's Sixth Amendment rights to counsel are protected.  And Mr. Duran has, as Mr. Manning said, serious concerns about Ms. Repkow's legal judgment at this time as demonstrated in these matters involving another client, matters which have happened very recently.

And when we see her coming before this Court on a serious matter, I think the office cannot stand back at a time when we have such questions about the judgment of a lawyer and let that lawyer proceed to try such a serious and difficult case... [T]he matters that have been related to me tend to show a failure to exercise good legal judgment, failure to understand role [sic] as counsel and perhaps a failure to be able to focus and to do the work in this matter that is required because of these other concerns.

So there is the concern about the judgment.  There's also the concern that other matters may be preceding [sic] simultaneously with this case, other personnel matters - -" RT 2161.
....

There's also a high likelihood of some adverse publicity shortly.  Things seem to have become public in a way that was not anticipated.  And we don't know what's going to happen, frankly.  And it could be something that would have a serious impact, on Ms. Repkow personally and on this trial.  RT 2161.

Mr. Loehr referred to "a significant lapse in judgment" by Ms. Repkow with regard to a former client who had been represented by Repkow in which the OPD, a month prior, had had to declare a legal conflict (the unidentified person subsequently represented by Mr.

13

Clymo and Mr. Millard).  RT 2162-63.  Mr. Loehr stated that "under Rule 3-310, matters relating to former clients that would substantially affect a current representation do form the basis for a legal conflict," but he asserted that the more important concern was the Sixth Amendment duty to ascertain what the conflict is and to always be prepared to provide the client with vigorous and adequate representation.  RT 2163.

Ms. Repkow then defended herself by asserting that any matters affecting a former client or any error of judgment on her part with regard to any such person had nothing to do with petitioner and that there was no question of her professional relationship with petitioner.  RT 2164.  She claimed that what had recently affected her concentration on petitioner's trial had been discussions of issues in her office and that petitioner would be best represented by her.  RT 2164.  She conceded that she was distraught and had been crying on the previous Friday, but that she regarded her crying, which she said was rare for her, as healthy in the circumstances.  RT 2164-65.  She stated she was under even more pressure at the then-current point and was not crying and reiterated that petitioner would be served best if she continued to represent him.  RT 2165.

The judge ascertained that petitioner had heard everything up to that point and still wanted Repkow to represent him.  RT 2165-66.  Mr. Manning interjected that he did not believe that petitioner could waive the issue.  RT 2166.  A discussion ensued wherein it was made clear that an investigation would continue into Ms. Repkow's conduct and that any action by the public defender as to Ms. Repkow's future employment in that office would be concluded before the trial ended.  RT 2166-2170.

When asked by the court, still in petitioner's presence, whether or not it was the position of the public defender's office (OPD) that Ms. Repkow would not be able to provide constitutionally adequate representation of counsel based on information the office had received, RT 2170-71, Mr. Manning responded:

It is our belief based on internal personnel matters, matters that

14

have come to our attention through information that has been provided to us by the Sheriff's Department, information that has been presented to Ms. Repkow in the form of a letter by Mr. Duran, her conduct last week and on Friday, her conduct with a prior client, her conduct with other prior clients in our office, that we believe that if that hits the public during this trial that we cannot guarantee this Court that Ms. Repkow will be able to assist effectively in insuring that Mr. Brewer has the proper right to counsel.

The Court: That clarifies a lot.
Now, just so I understand, assume for the sake of argument that no information gets out to the public and that there's no further personnel actions, and Ms. Repkow is left to simply work on this one case and defend Mr. Brewer to the best of her ability at this time, would you still have the same position on behalf of the office?

Mr. Manning: The personnel action will proceed.  What the final result of that personnel action, I'm not Mr. Duran.  So until I present the investigative report to him, I don't know what that final personnel action will be.

I will say that based on my review and evaluation of this case, some of the matters that are – Ms. Repkow is concerned about is [sic] termination from our office is public disclosure of the events that led up to this investigation, and it's our belief that that being on her mind and her poor judgment on prior cases in our office, that we cannot certify to this Court that she can properly and effectively provide the assistance that is necessary in the defense of a case of this nature.  And that the personnel action in this case was contemplated to be finished long before six months.

RT 2171-2172.

At that point, Ms. Repkow interjected that the office was stating this position for the first time and that all of the information was known to them as of the afternoon of Friday before when it was represented to the court that she could continue to represent petitioner.  RT 2172.  She also remarked that as of Friday afternoon she was not being told she could be fired in 30 days, but she acknowledged that that was "a fear at the back of my mind."  RT 2172-73.  The trial judge then attempted to discern what could have happened between 2:00 p.m. on the previous Friday [March 30, 2001] and 10:00 a.m. on that next Monday [April 2, 2001] that caused the OPD to question Ms. Repkow's competence, stating that "it appears that the one thing

15

that I hear that's new is that this may get out and become public." RT 2173.[7]

> The Court: And Friday at 2:00 o'clock you were competent to handle the case. What I'm trying to find out is what happened between Friday at 2:00 and this morning at 10:00 that caused you not to be competent to handle the case. And the only thing that's new information that I hear is that it may become public, and as a result of it becoming public, it may cause tremendous stress upon not only the office, but you personally, Ms. Repkow.
>
> And further important now, I also understand there's a misunderstanding regarding length of trial, so there could be a personnel action prior to this trial which would create another whole issue.

RT 2174.

Ms. Repkow acknowledged that she had been "worried about a personnel action" since receiving a "directive a couple of weeks ago." RT 2174. But she continued to protest that although she was worried about being fired that as of Friday afternoon she understood that she was "okay to proceed on this trial...." RT 2174. Mr. Manning clarified that he did not speak for Mr. Duran regarding the resolution of the personnel matter but that the matter would not rest for six months [his newly understood time frame for the length of the trial]. RT 2175. He also stated that "this should not come as a shock to Ms. Repkow because during her improper contact with a prior client of ours that was discussed numerous times the fact of termination being a possibility of this contact." RT 2175. Petitioner was present for this entire discussion up to the point when the trial judge asked if there were any other issues to be brought up. In what set up the issue in Claim 2 Mr. Manning responded:

> The only thing I would say to the Court is that I believe within the parameters of discussing this issue and providing privacy to Ms.

---

[7] Following an in camera hearing (RT 2120-2125), Mr. Manning on the record in open court, on Friday, March 30, 2001, had requested a one-week continuance, "based on the personal problems that Ms. Repkow is having,... so that she can be prepared to represent Mr. Brewer when this trial starts with the first witness." RT 2126. The continuance, until April 9, 2001, was granted although Mr. Manning assured the court that Ms. Repkow would be present on April 2, 2001, for the hearing on a motion filed by another counsel and for "other miscellaneous matters...." RT 2127.

> Repkow concerning these personnel matters, I have not disclosed
> in exact detail what the issues are in our office.  And I believe it
> would be inappropriate to discuss those issues especially with Mr.
> Brewer present since they are personnel issues.

RT 2176.

Mr. Loehr also requested a hearing in petitioner's absence if the court wanted more detail.  RT 2176.  Mr. Manning later reinforced the request: "And as I indicated to the Court, if the Court desires additional information we are ready to provide that information to the Court as long as Mr. Brewer is removed from the hearing."  RT 2181.  Mr. Loehr had also earlier expressed that they were "to some extent...speaking in generalities...," in addition to their concern for Ms. Repkow's "privacy interests" in the pending "personnel actions," they also were concerned about guarding the privacy of the former client, stating "[t]here are matters that are private with respect to that client that Mr. Brewer perhaps should not be privy to."  RT 2160. Ms. Repkow continued to argue for her competence to represent the petitioner; she also averred that raising "a possible reason as to why there could be problems in the future....doesn't have any bearing on my competence to adequately and fairly represent...petitioner."  RT 2182.

After petitioner was removed for the court to be provided with greater detail, Ms. Repkow again alert, perhaps over-alert, to the interests of the former client, immediately asked on behalf of Mr. Millard and Mr. Clymo whether they could be present to protect their client's interests as he was the one involved in the personnel action, which request was denied with the judge expressing no interest in hearing the name of anyone involved.  RT 2184.

Mr. Manning proceeded to provide more specific information, beginning with informing the judge that in January of that year, the OPD had to declare a conflict with a client represented by Ms. Repkow, at which point she had been directed by Paulino Duran to have no more contact with that client.  RT 2184.  After the first or second week in March, according to Manning, the OPD was informed by law enforcement that:

> Ms. Repkow had had continuing contact with that client to include
> the attorney-client room when she no longer represented the client
> and they were informing us at that date they were revoking any

1     privilege she might have to use the attorney-client room at that
2     time.

3  RT 2184.

4           Without characterizing the phone calls other than to indicate they were of a

5  "nonlegal nature," Manning stated that the office was provided with information that phone calls

6  between the former client and Ms. Repkow continued with calls made both to her home and

7  office.  RT 2184.   The OPD also learned that Ms. Repkow passed contraband to the former

8  client as well as violated the rules of the sheriff's department by using the attorney-client room

9  for social visits with the former client.  RT 2185.  In addition, Manning said, Repkow was using

10 other former clients and inmates to communicate with the subject (but unidentified) former client

11 when he could not communicate with her.  RT 2185.  When Duran directed her in writing to have

12 no further contact with that client, Repkow nevertheless on the prior Friday received a phone call

13 from that person, about which she did inform the office.  RT 2185.  Thus, because she had

14 disregarded Duran's direction and after discussions with other office attorneys, the OPD re-

15 assessed their evaluation of Repkow's judgment, the situation with the former client and also

16 considered how the personnel matter and other issues would impact her, concluding that they

17 could not assure the court that Ms. Repkow could adequately represent petitioner throughout the

18 trial.  RT 2185-2186.

19          Manning clarified that the initial conflict arose from Repkow's passing

20 contraband to jail clients and also from an allegation by a client as to a relationship with Repkow,

21 which relationship did not involve petitioner.  RT 2186.  Mr. Loehr expressed regret about the

22 circumstances, remarking on Ms. Repkow's dedication to her clients but indicating that the

23 events of the prior months had caused Duran and Manning justifiably to question whether

24 Repkow could perceive accurately her role in representing clients.  RT 2186.  Mr. Loehr

25 continued:

26          And there are allegations of not understanding that, of stepping

over those bounds significantly, perhaps out of a sense of duty to these clients.  If you don't understand that role as a lawyer, you don't stand before the Court in the proper posture to provide the effective assistance of counsel.

So it's not really there's a personnel action possibly pending.  Who knows what's going to happen there?  That certainly would weigh on anybody's mind.  But as much for Ms. Repkow, we ask the Court to look at this and say is she right now able to properly understand her role as counselor?  Is there evidence that very recently she has not understood that role correctly?  Is she in a position to make an assessment of what is proper for her and Mr. Brewer?  I would argue that the facts show to the contrary.

And Mr. Duran is taking this action out of concern for Ms. Repkow as well as for Mr. Brewer.  I'm sure she doesn't see it that way, but that's the bottom line.

RT 2187.

Ms. Repkow persisted in asserting her belief that the OPD was wrong about her ability to competently represent petitioner.  RT 2187-2188.  She spoke of issues regarding her handing of mail to inmate clients and of a client having been found in possession of tobacco as having occurred some time in the past and asserted with regard to her contact with the former client that petitioner had no connection to that or to the mail issue.  RT 2188.  She argued that any bad judgment she may have shown had no connection to petitioner or her ability to represent him.  RT 2189.  This portion of the in camera hearing outside petitioner's presence concluded after her assertion that:

It's still my position that I don't believe that anything has occurred or changed or come to the attention of my office that justifies the change in position from Friday to today's date.

The Court:  That's the bottom line.

Mr. Manning:  That's the bottom line.

RT 2189.

The court then adjourned, promising a ruling on the next day.  Id.

The in camera hearing resumed the following day, on April 3, 2001, this time including petitioner, as well as the judge, Repkow, Manning and Loehr.   RT 2190.  Repkow laid

19

out for the judge in some detail her work on petitioner's case in an effort to counter any allegations that petitioner might have ineffective assistance of counsel (IAC) should she proceed as his attorney, beginning with her assignment as his representative in January of 1997.  RT 2191-93.  She reiterated in this hearing in which the petitioner was present that he wished to keep her as his counsel notwithstanding the conflict her office claimed, stating that it was the office which had a conflict with her about her representing petitioner, clearly intimating no conflict of her own with petitioner.  RT 2193-94.  Her proposed solution was to present an alternative of resigning from the OPD and asking the court to appoint her as counsel for petitioner.  RT 2194. The court found the proposal premature and closed and sealed the in camera hearing, indicating that a ruling would be made on the OPD's motion before all counsel and defendants.  RT 2194-2195.  Shortly thereafter, the court ruled against the OPD's motion, denying it on the basis that there was no actual conflict of interest identified and as to any potential conflict of interest, which the court found to exist more between the OPD and Ms. Repkow, rather than between Repkow and petitioner, petitioner knowingly waived any such conflict.  RT 2197-2206.

The following colloquy then occurred between the trial judge and petitioner.  FAP P&A (hereafter, FAP), pp. 24-27:

> THE COURT: [You] have heard the concerns, have you not, of the Public Defender's office with respect to her continued representation of you in this matter?
>
> DEFENDANT BREWER: Yes, but I don't understand some of them, like IAC and all that.
>
> THE COURT: Forgive me. The IAC referencing ineffective assistance of counsel, meaning the attorney is not able to effectively represent his or her client.
> Is there anything else you had not understood?
>
> DEFENDANT BREWER: Well, pretty much all of it, but I still want Ms. Repkow to represent me.
>
> THE COURT: When you say pretty much all of it, you don't understand all of it?
>
> DEFENDANT BREWER: I mean, not really.

20

1   THE COURT: Well, let me just very briefly inform you that you
    know at this time Ms. Repkow is employed by the Public
2   Defender's office?

3   DEFENDANT BREWER: Yes, sir.

4   THE COURT: Okay.  And you understand that Mr. Manning and
    Mr. Loehr have made a request of this Court that the Public
5   Defender's office be relieved from representing you. You're
    aware of that?

6
    DEFENDANT BREWER: Yes, sir.
7
    THE COURT: And you are aware of the reason for making that
8   motion?

9   DEFENDANT BREWER: Yes, sir.

10  THE COURT: And that reason is that they do not feel that Ms.
    Repkow will be able to effectively represent you in this case. You
11  understand that?

12  DEFENDANT BREWER: Yes, sir.

13  THE COURT: And one of the reasons for that claim by the
    Public Defender's office is that there may be issues that Ms.
14  Repkow may have to deal with with respect to her employment
    with that office which they feel may affect her ability to be focused
15  on this case completely.  Do you understand that?

16  DEFENDANT BREWER: Yes, sir.

17  THE COURT: Are you following everything up to this point?

18  DEFENDANT BREWER: (Nodding head affirmatively.)

19  THE COURT: You have to stay [sic] yes so we have it on the
    record.
20
    DEFENDANT BREWER: Yes, sir.
21
    THE COURT: All right. The issue of the conflict of interest, as I
22  stated earlier, is whether or not Ms. Repkow's representation and
    her effectiveness to represent you might in some way be distractive
23  or diluted because of some other factors in her life whether it be
    personal, employment wise or other issues. Do you understand
24  that?

25  DEFENDANT BREWER: Yes, sir.

26  THE COURT: That is the main reason – correct me if I'm wrong

21

1    Mr. Manning or Mr. Loehr – that the Public Defender's office is
     not comfortable with Ms. Repkow continuing to represent you.
2    Do you understand that, Mr. Brewer?

3    DEFENDANT BREWER: Yes.

4    THE COURT: And that they're concerned her attention may be
     divided among other things. I'm trying to repeat this so there's no
5    question. You understand that?

6    DEFENDANT BREWER: Yes.

7    THE COURT: It is possible that if you proceed with your current
     counsel, Ms. Repkow, that she might be distracted for some period
8    of time and that however slightly, that that may increase your
     chances of being convicted in this matter. Do you understand that?
9
     DEFENDANT BREWER: Yeah, I think so, yes.
10
     THE COURT: If you don't, clarify this because I'm trying to go
11   as detailed as I can and try to give you all the potential problems
     you may run into.
12
     The position is that if Ms. Repkow, or anyone for that matter, may
13   be distracted by whatever's going on in their personal life that
     they may not be able to devote their full time to your case. That's
14   what the Public Defender's office is saying. Ms. Repkow is
     saying that it won't. I want to make sure that you understand both
15   sides.  Do you see the situation here?

16   DEFENDANT BREWER: Yes.

17   THE COURT: And you understand that you have the right to be
     represented by an attorney who is conflict free. In other words,
18   can devote substantially all of his or her time to representing you
     in this case. Do you understand that?
19
     DEFENDANT BREWER: Yes.
20
     THE COURT: Do you feel that you have had an adequate time to
21   discuss Ms. Repkow's continued representation of you with her?
     Have you talked about this?
22
     DEFENDANT BREWER: Yes.
23
     THE COURT: Are you comfortable that you had sufficient time
24   to talk to her about this whole issue?

25   DEFENDANT BREWER: Comfortable with her?

26   THE COURT: Yes.

1    DEFENDANT BREWER: Yes.

2    THE COURT: I have called for and is present, there is an attorney
     from the Indigent Defense Panel present in this courtroom. I am

3    going to make an offer to you at this time that you speak to another
     attorney regarding this possible conflict. Do you wish to do this,

4    speak to another attorney?

5    DEFENDANT BREWER: No. No, sir.

6    THE COURT: You're comfortable with the decision that you've
     made in this matter?

7

8    DEFENDANT BREWER: With Karol representing me?

     THE COURT: Yes, absolutely.
9
     DEFENDANT BREWER: Yes.
10

11   RT 2202-2206.[8]

12          Petitioner contends further that the trial court "misadvised" him with regard to the

13   facts disclosed at the hearing to which he was not privy, emphasizing the following excerpted

14   statement by the court from the portion of the trial transcript set forth above:

15          I'm trying to go as detailed as I can and try to give you all the
            potential problems you may run into.
16
            The position is that if Ms. Repkow, or anyone for that matter, may
17          be distracted by whatever's going on in their personal life that
            they may not be able to devote their full time to your case. That's
18          what the Public Defender's office is saying. Ms. Repkow is
            saying that it won't. I want to make sure that you understand both
19          sides.  Do you see the situation here?

20   FAP, p. 34, citing RT 2204-2205.

21          Petitioner again confirmed that he wanted Repkow to continue as

22   his counsel, after the trial court denied the public defender's motion to withdraw.  FAP, pp. 27-

23   28, citing RT 2206, 2217.  After Repkow was appointed, in her individual capacity, as counsel,

24   _____

25          [8] The court has transcribed this colloquy, as well as any other excerpts from the trial
     record, directly from the Reporter's Transcript, rather than from petitioner's or respondent's
26   briefing, in order to most precisely reflect any exchange as it stands in the record.

1  following her resignation from the public defender's office, CT 2351-2354; RT 2215-2219, the

2  trial judge had petitioner state on the record that he wanted Repkow to continue representing

3  him, but petitioner emphasizes that he stated at that point that he was only aware of those matters

4  discussed in court:

> The Court: Mr. Brewer, you were present at the time that the public
> defender's office came in; is that correct?
>
> Defendant Brewer: *Other than when you sent me out.*
>
> The Court.  Pardon?
>
> Defendant Brewer: *Other than when you sent me out.  And I didn't
> know what you were talking about.*

10  RT 2225. (Emphasis added)[9]

11      2. <u>Analysis Finding Valid Waiver AEDPA Unreasonable</u>

12          <u>State Court's Reasoning</u>

13          The appellate court's rationale on the issue of waiver and conflict is excerpted

14  below:

> Brewer's more substantial contention is that the full nature of
> Repkow's potential conflict was not disclosed to him, particularly
> since part of it was discussed at a closed hearing where he was not
> present. He contends his waiver of a potential conflict was not fully
> informed and therefore was not valid.
>
> Before addressing the contention it is useful to define the scope
> and nature of the potential conflict asserted by the Public
> Defender's Office. As discussed above, there was an initial concern
> that confidences of a prior client might have to be revealed, but this
> concern turned out to be unfounded, as neither confidences nor
> even the identity of the prior client were revealed. The Public
> Defender's Office raised two concerns about Repkow's continued
> representation of Brewer. First was the concern that because of
> personal issues (her relationship with a prior client) and
> employment issues (the investigation that might lead to her
> termination) she might be distracted from representing Brewer;
> indeed, she had been so distraught she was unable to attend court.

---

25      [9] It may have been that the court was referring to the initiation of representation by the
Public Defender; however, what is important is petitioner's response that he did not know what
26  went on during the in camera hearing.

We shall refer to this potential conflict as the "distraction conflict." The second issue was the belief that Repkow's prior (and perhaps ongoing) conduct called into question her professional judgment and rendered her incapable of providing effective assistance to a client. We shall refer to this potential conflict as the "competency conflict."

"When a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [citation]. If the court determines that a waiver of a conflict of interest by the defendant is called for, it must assure itself that ' "(1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." [Citations.]' [Citation.] A trial court's failure to inquire into the possibility of a conflict of interest or to adequately respond to its inquiry is reversible error only if the defendant shows 'that an actual conflict of interest existed and that that conflict adversely affected counsel's performance.' [Citation.]" ( *People v. Jones* (1991) 53 Cal.3d 1115, 1136-1137.)

"In deciding whether a defendant understands the nature of a possible conflict of interest with counsel, the trial court need not explore each foreseeable conflict and consequence. [Citation.] Nor does a defendant's waiver of conflict-free counsel extend merely to matters discussed on the record. [Citation.]" ( *People v. Sanchez* (1995) 12 Cal.4th 1, 47-48.) Strict rules are neither necessary nor workable in this situation. ( Ibid.)

As to the potential "distraction conflict" the trial court fully performed its duty. The court determined that Brewer (1) had discussed the potential conflict with Repkow, (2) had declined the opportunity to discuss it with another attorney, (3) was aware of the dangers and possible consequences of proceeding, including a greater risk of conviction, and (4) wished to waive the potential conflict. The court advised Brewer of "the basic problem;" it was not required to explain every conceivable ramification. ( *People v. Clark* (1992) 3 Cal.4th 41, 140.)

In any event, Brewer cannot show that an actual conflict of interest existed and that conflict adversely affected Repkow's performance. ( *People v. Bonin* (1989) 47 Cal.3d 808, 837-838.)

As to the potential "competency conflict," we are not convinced this is a conflict that could be waived. We seriously question whether Brewer, or any defendant, could waive effective assistance of counsel. (See *People v. Sapp*, *supra*, 31 Cal.4th 240, 255.)

Rather, should this potential "conflict" become actual-that is, Repkow fail to provide effective assistance-the trial court would have to act. As we discuss below, the potential never turned into the actual. Instead of seeking a waiver from Brewer, the trial court determined there was no ineffective assistance of counsel, so no action was then necessary. The trial court acted properly in this regard.

Brewer contends he had the right to be advised of Repkow's relationship with the prior client, analogizing the situation to *People v. Jackson* (1985) 167 Cal.App.3d 829. In *Jackson*, after the conclusion of the trial, defendant learned his attorney had a dating relationship with the prosecutor and he moved for a new trial, which was denied. On appeal he claimed ineffective assistance of counsel and prosecutorial misconduct. ( *Id.* at p. 831.) This court reversed the judgment. The court found that the close relationship between counsel opposing each other gave rise to speculation that counsel's professional judgment and zealous representation were compromised. "No matter how well intentioned defense counsel is in carrying out his responsibilities to the accused, he may be subject to subtle influences manifested, for example, in a reluctance to engage in abrasive confrontation with opposing counsel during settlement negotiations and trial advocacy." ( *Id.* at p. 833.)

No such concerns are present here because the relationship at issue was not with anyone involved in the trial. There was no indication that the relationship had any effect on Repkow's zealous representation of Brewer.

Brewer contends he was entitled to be present during the portion of the closed hearing where Repkow's conduct with the prior client was discussed. He relies on *Campbell v. Rice* (9th Cir.2002) 302 F.3d 892, in which the Ninth Circuit found a due process violation where defendant was completely excluded from the hearing on counsel's potential conflict. Defense counsel faced a criminal prosecution on a drug charge by the same district attorney's office that was prosecuting defendant. ( *Id.* at p. 895.) The court held a hearing with the defense counsel and the prosecutor; defendant was not present nor informed of the hearing. The prosecutor told the court his office had made defense counsel an offer that was neither more severe nor more lenient than that offered to other eligible defendants; counsel would not receive favorable treatment. Defense counsel had no comment and the court found no conflict. (*Id.* at pp. 895-896.)

On habeas review, the Ninth Circuit rejected defendant's conflict of interest claim, but found merit in his due process claim. ( *Campbell v. Rice, supra*, 302 F.3d at pp. 897-898.) The court found the hearing to determine if defendant's right to conflict-free counsel had been violated was a critical stage of the criminal proceedings.

26

( *Id.* at p. 899.) Defendant's presence would have contributed to the fairness of the proceedings because no one was representing his interests. ( *Ibid.*)

We find *Campbell v. Rice*, *supra*, 302 F.3d 892 distinguishable. First, Brewer was not absent from the entire hearing on the issue of whether his attorney had a conflict; he was present for most of the hearing and the trial court described the potential conflict to him and took an informed waiver. Second, there was always someone present to represent Brewer's interests because there were two members of the public defender's office, counsel of record, present.

These two points also distinguish this case from *King v. Superior Court* (2003) 107 Cal.App.4th 929, 947, in which this court found a hearing to determine whether defendant had forfeited the right to counsel was a critical stage of criminal proceedings at which defendant was entitled to assistance of counsel. At issue in *King* was the nature of the entire hearing to determine forfeiture of counsel, not a small portion of the hearing as here. Further, in *King*, defendant was completely denied assistance of counsel because his attorney argued against him. ( *Id.* at p. 950 .) Here, Brewer's interests were always represented.

The discussion during the portion of the hearing where Brewer was excused went primarily to the alleged "competency conflict." Manning disclosed the details of Repkow's contact with the prior client to explain why the public defender's office believed she could not provide effective assistance of counsel. The issue, therefore, was whether Repkow could provide effective assistance of counsel, not whether she-or the public defender's office-had a disabling conflict. Brewer offers no authority that defendant's right to be present extends to a hearing on counsel's competency. The California Supreme Court has suggested otherwise.

In *People v. Hovey* (1988) 44 Cal.3d 543, defendant was not present during a hearing to determine if defense counsel was continuing to provide effective assistance. After the hearing, the trial court found counsel competent to represent defendant. The high court found no error. "We conclude that defendant was properly excluded from the competency hearing, for it is very doubtful as a matter of sound public policy that a criminal defendant's presence should be required at in-chambers inquiries regarding his counsel's competence, unless the defendant himself has initiated the inquiry. Attendance at such hearings could well undermine the confidence and cooperation so necessary to insure an effective representation." ( *Id.* at p. 573.)

Advised of a potential conflict facing defense counsel, the trial court inquired into the conflict and responded by eliciting a waiver from Brewer. We find both the inquiry and the response adequate.

1   People v. Brewer, 2005 WL 290021 *11-14 .

2   As noted, petitioner claims that by his being excluded from the portion of the hearing wherein

3   matters were delved into with more detail, he was left unaware that his counsel had a personal

4   relationship with another client, was barred from using the attorney-client or pass through

5   window at the jail, that her phone calls were being intercepted or that the OPD had doubts about

6   her competency based upon their review of other matters.

7           Petitioner maintains that he came to regret what he characterizes as his

8   "uninformed waiver" and that the representation by the trial judge that he had been "as detailed

9   as I can" was untrue as having "omitted nearly every fact of any importance regarding the

10  problem with Repkow's continued representation."  FAP, p. 34.  His regret took the form of

11  some nine subsequent Marsden motions, in some of which Repkow joined.  Id.  Specifically,

12  petitioner argues that the trial judge did not inform petitioner that Repkow would soon no longer

13  have access to the jail's attorney-client room (or pass through window), which required them to

14  engage in loud and public conversations when the restriction was instituted about which

15  petitioner immediately complained.  FAP, p. 34, citing RT 6036-6043, 6246-6248.  Petitioner

16  maintains that Repkow admitted that this restriction resulted in their communications being "all

17  but impossible to conduct properly."  FAP, pp. 34-35, citing 6231-6233, 6237-6238, 6250-6251.

18  Petitioner also argues that he was never given the "actual 'details,'" by which he evidently

19  means, the precise nature of, the OPD's complaints against Repkow.  FAP, p. 35.  But, of course,

20  the trial court did not, as can be seen by the recounting of the now unsealed in camera hearing,

21  actually delve into those precise details.  For example, when petitioner accuses the court of

22  having hidden "the fact that the dispute centered around an extremely embarrassing series of

23  incidents involving Repkow's involvement with another client" which the petitioner would only

24  belatedly discover "through humiliating jeers from the jailers, punctuated by headlines in the

25  paper" (id., citing RT 7819-7836), it does not appear from the record of the portion of the hearing

26  from which he was excluded that the judge was informed of that level of detail and the fact that

1  the incidents might become public was speculative.

2          Petitioner maintains that all he knew from the court's disclosure was that his trial

3  counsel had "personal" problems.  FAP, p. 35.  Of course, this discounts that petitioner was

4  present for much of the hearing wherein the OPD represented that it had problems with Repkow

5  regarding her involvement with a former client, as well as with vaguely described matters with

6  other clients, and had concerns about her judgment, as well as about the potential for information

7  about Repkow becoming public while trial proceeded; on the other hand, this information was

8  kept pretty broad and general in petitioner's presence.  In any event, petitioner maintains that the

9  many Marsden motions prove that petitioner would never have waived the conflict had he been

10 adequately informed of the problems that were about to ensue and that the exclusion of him from

11 a crucial hearing combined with the court's lack of full disclosure of what was revealed therein

12 violated petitioner's right to due process.  FAP, pp. 35, 37.

13         Respondent concedes that petitioner was not informed about the inappropriate

14 relationship and its details or about his counsel's loss of the use of the attorney-client jail room.

15 Answer, p. 20.  Respondent points out that he was notified that the distractions to which Repkow

16 was subject could increase his chances of conviction and that the OPD believed she could not

17 effectively represent him but maintain that petitioner has not shown he had a constitutional right

18 to the information regarding the OPD's doubts as to his counsel's competency revealed at the

19 portion of the hearing from which he was excluded.  Id.  Respondent minimizes petitioner's

20 complaints resulting from subsequent events, while conceding that the trial court neither advised

21 petitioner that he would be "teased by other inmates" because of Repkow's previous behavior or

22 that he would not be able to use the attorney client room at the jail with Repkow as his counsel,

23 which respondent characterizes as "inconvenient."  Id.  Respondent dismisses as not implicating

24 due process concerns any complaints about petitioner's being "teased by other inmates and

25 jailers," and while respondent admits that the difficulty in communication with his attorney

26 "hints at constitutional concerns," the state maintains that petitioner did not plead or prove that

he was prevented from speaking with his attorney and did not attempt to show any particular

information he was unable to share with her or that he was thereby unfairly "concretely hindered"

from presenting his defense.  Answer, p. 21.

As noted above, in his traverse, petitioner disclaims his prior contention that the

requisite prejudice for a Sixth Amendment violation could not be shown, basing his argument

with regard to prejudice on the "controlling authority" as articulated in Bradley v. Henry, 510

F.3d 1093 (9th Cir. 2007)(en banc).  Respondent counters that this case is simply not applicable

insofar as it deals with whether or not a defendant can substitute retained for appointed counsel

in a certain situation and that the harmless error review applied was tailored to the error that was

alleged, although respondent takes issue with the Ninth Circuit's failure to apply the standard of

Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993) (whether an error "had

substantial and injurious effect or influence in determining the jury's verdict" [internal citation

omitted]).  Sur-reply, p. 6.  Respondent maintains that in this instance the determination rests on

whether the state unreasonably applied clearly established Supreme Court precedent with regard

to petitioner's right to be present at trial and that the focus of such a determination must be an

analysis of the effect of any alleged error on the verdict, contending that petitioner wishes to

focus on the standard of whether there was a breakdown of the attorney client relationship

because petitioner has already conceded that he cannot show his counsel was ineffective.  Sur-

reply, pp. 6-7.

Analysis

    1.  Conflict of Counsel – Legal Standards

The Supreme Court has long recognized under the Sixth Amendment,

"correlative" to the constitutional right to counsel, one's "right to representation that is free from

conflicts of interest."  Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097, 1103 (1981), citing

Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708 [] (1980); Holloway v. Arkansas, 435 U.S. 475,

481, 98 S.Ct. 1173, 1177 [] (1978); see also Alberni v. McDaniel, 458 F.3d 860, 869 (9th Cir.

1    2006); <u>Lewis v. Mayle</u>, 391 F.3d 989, 995 (9th Cir. 2004) ("The Sixth Amendment includes a

2    correlative right to representation free from conflicts of interest," citing <u>Wood</u>, <u>supra</u>); <u>Garcia v.</u>

3    <u>Bunnell</u>, 33 F.3d 1193, 1195 (9th Cir. 1994).  To safeguard a defendant's right to conflict-free

4    counsel, a trial court must initiate an inquiry when it knows or reasonably should know of the

5    possibility of a conflict of interest.  <u>Wood</u>, <u>supra</u>, 450 U.S. at 272, 101 S. Ct. at 1104; <u>see</u> <u>also</u>

6    <u>Wheat v. United States</u>, 486 U.S. 153, 160, 108 S. Ct. 1692, 1697 (1988); <u>Cuyler v. Sullivan</u>, 446

7    U.S. 335, 347, 100 S. Ct. 1708, 1717 (1980).  After inquiry, the court has the duty "either to

8    appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of

9    interest is] . . . too remote to warrant separate counsel."  <u>United States v. Crespo de Llano</u>, 830

10    F.2d 1532, 1538 (9th Cir. 1987) (quoting <u>Holloway v. Arkansas</u>, 435 U.S. 475, 484, 98 S. Ct.

11    1173). [10]

12        The Supreme Court has determined that where a trial court fails to inquire into a

13    potential conflict of interest there must be a showing of defective performance, but not the

14    additional showing under <u>Strickland</u> of a probable effect on the outcome of trial.  <u>Mickens v.</u>

15    <u>Taylor</u>, 535 U.S. 162, 174, 122 S. Ct. 1237, 1245 (2002); <u>Vansickel v. White</u>, 166 F.3d 953, 962

16    (9th Cir. 1999) (actual conflict of interest by counsel requires that defendant demonstrate adverse

17    effect on counsel's performance, not upon the trial outcome).  In order to be entitled to relief

18    based on a lawyer's conflict of interest, "a defendant who raised no objection at trial must

19    demonstrate that an actual conflict of interest adversely affected his lawyer's performance."

20    <u>Cuyler</u>, 446 U.S. at 348, 100 S. Ct. 1708.  Thus, one making such a claim must show that:  1) his

21    attorney actively represented conflicting interests, and 2) the conflict "actually affected" the

22

23

24

25        [10] Conflicts of interest broadly encompass all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his personal interests. <u>See</u> generally ABA, Model Rules Prof. Conduct rule 1.7 and

26    com. thereto.

adequacy of the attorney's representation.  Cuyler, 446 U.S. at 349-50, 100 S. Ct. 1708.[11]   Once an actual conflict is shown, a defendant need not establish prejudice, but he must demonstrate that the conflict adversely affected the lawyer's representation of his client.  See Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708.

In the case of a claimed potential conflict of interest, however, a showing of prejudice as required by Strickland, supra, 466 U.S. at 692-94, 104 S. Ct. at 2067-68, must be made.  Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995); see also, Paradis v. Arave, 130 F.3d 385, 391 n.5 (9th Cir. 1997).

"A defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests."  Holloway, 435 U.S. at 483, n.5.  See also United States v. Allen, 831 F.2d 1487, 1494 (9th Cir. 1987) ("[o]f course, a defendant may waive his right to the assistance of an attorney who is unhindered by conflicts . . . provided the waiver is given knowingly and intelligently.")  Whether there is a proper waiver should be determined by the trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458, 464-65, 58 S. Ct. 1019 (1938).  In addition, whether a defendant has made a valid waiver of his Sixth Amendment rights depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  Id.; Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880 (1981).

2.  Absence From the In Camera Hearing – Legal Standards

Petitioner relies on Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987), which sets forth that due process guarantees "a defendant ... the right to be present at any

---

[11] Petitioner could have premised his conflict claim more clearly as an ineffective assistance of counsel claim, contending his counsel had a potential conflict of interest which prejudiced his defense, Stoia v. United States, 109 F.3d 392, 395 (9th Cir. 1997), but petitioner, by initially conceding that he cannot even show "adverse effect" in the actual conflict context has essentially conceded that he cannot meet the more burdensome requisite prejudice standard (which standard, as noted, is articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052), applicable in the potential conflict scenario.

stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."   Respondent agrees in a sealed [sur-]reply to the traverse that Stincer, supra, is the clearly established law that is applicable but notes that therein it was found that a defendant's absence from a hearing concerning the competency of two witnesses who were minors did not violate due process.  Reply, p. 7.  Thus, it is clear that the primary focus of the issue here is the type of proceeding from which petitioner was excluded and its purpose.

    3.  Discussion

        The Court of Appeal in this case found that conflicts could arise in the situation where a counsel's ability to focus could be so diverted by unrelated matters that enough attention was not directed to the case at hand.  It went on to find that the trial court properly inquired into the asserted conflict. The undersigned agrees.  For reasons which will become apparent, the initial focus here is petitioner's absence from the in camera hearing and his afterwards waiver of any conflict.

        Three Ninth Circuit cases provide instruction, but are not ultimately on point because of the nature and purpose of the in camera hearing here.  In the most important case, Campbell v. Rice, supra, 408 F.3d 1166 (en banc), a habeas petitioner's trial attorney had been arrested herself for transporting methamphetamine into the County jail.  In an in camera hearing which petitioner was not invited to attend, the issue of counsel's ability to represent petitioner despite the looming charge against her was addressed.  The trial court found insufficient or no conflict.  The Ninth Circuit discussed the conflict issue first, assumed the conflict, and found insufficient adverse effect or prejudice.  It then discussed petitioner's absence from the hearing, but found that since petitioner could not establish prejudice or adverse effect from his attorney's representation, petitioner's absence from the in camera hearing was similarly non-prejudicial.

        In the present case, however, a primary purpose of the hearing was to obtain facts to assess the already found conflict, *and* to obtain facts with which to advise petitioner so that he could waive any conflict if he so desired.  Because petitioner was going to have to make an

informed choice in a waiver proceeding, his presence was necessary such that he could hear the rather impassioned speech by the Public Defender personnel as to why Repkow was not competent to proceed further in the trial.  There would be no prejudice, nevertheless, if petitioner was advised on precisely the same facts by some method outside the in camera hearing.

His counsel Repkow averred that she had "generally" advised petitioner about the facts, but not enough is known about the advisement to make use of it at present.  More will be said about this in connection with the evidentiary hearing.

The Court of Appeal at *13 (2009 WL 290021) rejected petitioner's claim that he should have been present at the in camera hearing because (a) he had been present at all the substantial in-court discussion about the Repkow problem, and (b) two members of the public defender's office were present arguing the position petitioner would later take.  Focusing on this latter justification first, the undersigned finds it AEDPA unreasonable because it begs the issue here.  It was *petitioner* who was going to have to make a waiver decision, not these counsel.  It was *petitioner* who was going to have to be informed of the facts in order to make that determination.  Indeed, as set forth in the facts, the trial judge had emphasized the need for petitioner to be present to hear the facts, and then inexplicably determined that petitioner did not have to hear the detailed facts.

The first justification advanced requires much more thought.  If reviewed *de novo* the undersigned would find that petitioner's presence at the hearing, in the words of <u>Stincer</u> would have "contribute[d] to the fairness of the procedure."  Again, petitioner was entitled to be informed as much as possible about Repkow's problems, and he needed to be there where the facts of the conflict were substantially fleshed out.  However, utilizing the required AEDPA standard, the undersigned has much pause.

It is true that petitioner heard quite a bit about Repkow's problems in court.  The undersigned has gone to great lengths to exhaustively detail what petitioner heard.  Nevertheless, the sterility of what had been discussed in court was stripped away at the in camera hearing.

These unvarnished facts disclosed at the in camera hearing would have been important to the reasonable defendant in making his later decision.  It is quite one thing to know generally of a personnel problem that may lead to discipline, and another to assess the weight and importance of that general knowledge when confronted with the specific facts.  If given the specific facts, e.g., passing contraband in the jail, public exhibitions outside the jail, prospect of being denied use of the attorney-client room, petitioner might well have thought that his counsel was acting bizarrely, and that such action could well work to his detriment if she exhibited more or other bizarre behavior.  For example, one could be facing discipline because of an insubordinate attitude, or be facing discipline because the employee's acts went beyond the pale of any reasonable conduct.  Any reasonable person when facing a choice of continued association with the employee/counsel would want to know the facts which distinguished the situation.  Certainly, the bizarreness of Repkow's behavior was indirectly referenced in court, but it did not have the detail which could make the difference.

The undersigned further emphasizes the common sense fact that if the *in camera* hearing were necessary for the judge to hear the unvarnished facts, why would it be any less necessary for the decision maker on the conflict waiver, petitioner, to hear those facts.

Moreover, the reason for petitioner's exclusion from the hearing, Repkow's privacy interests, pales in comparison to petitioner's Sixth Amendment interest in being informed.  If Repkow had generally advised petitioner about the problems with another client, fairness dictated that she advise him, or he be advised at hearing, all the way.  After all, it was Repkow who insisted that she could adequately represent petitioner, and that the Public Defender was essentially overreacting.  If the facts were not a "big deal," why could they not be disclosed? If they were a "big deal" –, i.e., demonstrating conduct very unbecoming of a member of the defense bar, all the more reason for petitioner to know about them.  Finally, Repkow's problems were not exactly a closely guarded secret.  Her public exhibitions and participation in phone calls, which she had to have known were being listened to, cuts against any preservation of a

1   privacy interest.[12]

2          The record must show that a Sixth Amendment waiver was "made with eyes

3   open." United States v. Farhad, 190 F.3d 1097, 1099 (9th Cir. 1999); Lewis v. Mayle, 391 F.3d at

4   996-97 (9th Cir. 2004) (finding waiver invalid and state court objectively unreasonable even

5   where petitioner signed a written waiver as there was no evidence that he understood the

6   "specific ramifications" of the waiver as he did not seek outside counsel's advice "and had only a

7   cursory discussion with the judge").

8          Concluding in Lockhart v. Terhune, 250 F.3d 1223, 1232 (9th Cir. 2001), that the

9   state court's determination that a petitioner's waiver had been knowing and intelligent to be "an

10  unreasonable application of Supreme Court precedent," the Ninth Circuit stated:

11             For a waiver to be knowing and intelligent, the defendant must
               have been "sufficiently informed of the consequences of his
12             choice." Evans v. Raines, 705 F.2d 1479, 1480 (9th Cir.1983).
               Like other circuits, "[w]e do not require that a defendant predict
13             that particular dilemmas will present themselves, but we do require
               that a defendant know about all the risks that are likely to
14             develop." [Internal citations omitted.]
               ....
15
               We must "ascertain with certainty" that Lockhart knowingly and
16             intelligently waived his right to conflict-free counsel, Maiden [v.
               Bunnell], 35 F.3d at 481 n. 5 [9th Cir. 1994] (citing Johnson v.
17             Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, [] (1938)), by
               "focus[ing] on what the defendant understood." United States v.
18             Keen, 104 F.3d 1111, 1114 (9th Cir.1996).

19  Lockhart, supra, at 1232-33.[13]  See also Lewis v. Mayle , supra (a valid waiver requires a

20  knowledge of the ramifications of the waiver decision.)

21          Discussion must also be made of Hovey v. Ayers, 458 F.3d 892 (9th Cir. 2006).  In

22          [12] Nor did Repkow's acts of misconduct qualify in any respect as attorney-client
23   privileged vis-a-vis the object of her affections.  Passing contraband and acting out improperly on
     a personal relationship is not the passing of confidential information germane to the attorney-
24   client relationship.

25          [13] In Lockhart, 250 F.3d at 1226, the Ninth Circuit stated that prejudice is presumed when
     an unconstitutional actual conflict of interest is alleged and that harmless error analysis does not
26   apply; however, as observed previously, this is no longer the law.

Hovey, the trial judge became suspicious of defense counsel's overall competence because of lack of preparedness, a desire to build error into the record, or because of personal distractions. The trial judge sua sponte had several in camera hearings where he questioned counsel outside of the presence of the prosecution and the defendant. The defendant later claimed that he had been improperly excluded from the hearings. The Ninth Circuit assumed the right to be present at the hearing, but held that defendant could not have contributed anything significant to the court's determination of counsel's effectiveness on account of trial conduct, and further found that if the defendant wished to object to his counsel's conduct, the trial judge was ready to hear such a challenge, if and when it was made. Id. at 902-903. Here of course, the issue is one of waiver of conflict, a conflict which had been determined by the trial court to exist, and whether petitioner was adequately informed to make the waiver.

Finally, the undersigned refers to Bradley v. Henry, supra, 510 F.3d 1093, (en banc), amended 518 F.3d 657, in which the plurality decision found that the defendant had been improperly excluded from a hearing where it had been determined that the defendant could not afford counsel of choice. Although the plurality determination is not binding precedent, it does show the extent to which a defendant's right to be present is important, and prejudicially denied, if the presence of defendant has a real and definable purpose. Here, petitioner's presence was required to be fully informed for his waiver decision.

Given the above discussion, the undersigned finds that petitioner's exclusion from the in camera hearing was AEDPA error unless petitioner was aware at the time he waived any potential conflict of the specific facts as were discussed at the *in camera* hearing from another source – his counsel.

4. The Evidentiary Hearing

*Facts*

The evidentiary hearing was held on March 8, 2010. Both Repkow and petitioner testified.

Repkow testified in no uncertain terms that petitioner had been informed of her relationship with inmate Clark at the time of the *in camera* hearing, and that there were no secrets in that regard.

> [Repkow] I know I'm going on and on here, but what– Mr. Brewer was aware of my contact with the other inmate for some time prior to this, meaning prior to March and April–
>
> ***
>
> Q. ...When you say that Mr. Brewer was aware of the contact that you had with the other inmate, did you tell him what kind of contact that was?
> A.  Yes. He understood that I had a romantic relationship with the other inmate. The Court: And these are words, in essence, that you told Mr.Brewer?
> A. The Witness: Yes, and he found out– I mean, he handed me a note one time that turned out to be a communication from the other inmate and–
> By Mr. Riley:
> Q. Mr. Brewer did?
> A.  Yes, Mr. Brewer did...
> The Court: And did this passing of information occur prior to or after the in camera hearing where he was excluded?
> The Witness: It was prior to that.  It was during the months prior to March and April.  I was having telephone contact during those months with the other inmate and I remember telling him, you know, to stop–
> By Mr. Riley:
> Q. Telling who?
> A. The other inmate–
> Q. Okay.
> A. – to stop doing that; to not send notes to Mr. Brewer or other inmates.
> RT (Ev. Hrng.) 17-18.

In the last of her testimony to be quoted, Repkow unequivocally affirmed that petitioner was well aware of the specifics at the time of the in camera hearing:

> A. I am certain that he was– I'm pretty sure that he was aware that it was against my office's wishes because I think he understood the –well, and at the time that these hearings arose in March or April, well, it was made pretty obvious that they were opposed to it and I discussed with Mr. Brewer in detail at the time–
> Q.  I'm sorry, at what time?
> A. Well, at the time– when the public defender's office first approached the trial court, Mr. Brewer understood why the public defender's office wanted me ultimately off the case.
> Q. What did you say to him about that?
> A. I told him why they wanted me off the case and I– meaning my relationship with the other inmate and that I had disobeyed an order by maintaining contact with the other inmate and that it was alleged that I had given that other inmate tobacco; pretty much all the details of what was going on and I discussed with Mr. Brewer the fact that I still felt competent to represent him in this case and I asked him if he still wanted that.  For me to represent him.

RT (Ev. Hrng.) 21.

Cross-examination proved that Ms. Repkow had some confusion as to dates, especially the dates that her "pass-through" privileges at the jail were revoked the second time, but this impeachment did not mean that much to the undersigned.[14]  Ms. Repkow had nothing to gain or lose at this time by testifying to her discussions with Brewer.  Moreover, it was highly implausible that petitioner Brewer would not ask his counsel precisely what was communicated in the *in camera* session if he did not know already.  And, Ms. Repkow was not hiding the fact from the world at large that she was having some sort of relationship with an inmate; it makes no sense to believe that she was somehow hiding this from petitioner.

The issue here is not completely one-sided.  Petitioner did make several contemporaneous statements at various <u>Marsden</u> hearings, held a few months after the *in camera* hearing at issue here, indicating that he was not sure of what had been spoken about at the *in camera* hearing.

> The Court: Do you feel that Ms. Repkow has not properly represented you? And if you do, would you please explain why you feel this way and please go into detail as to the exact reasons for your feeling.
> Defendant Brewer: Okay.  I just feel that she's not questioning certain witnesses to the point to where she did at the preliminary hearing.
>
> &ast;&ast;&ast;
>
> The Court: How long have you had this feeling?
> Defendant Brewer: Really just the last few days.
>
> &ast;&ast;&ast;
>
> Defendant Brewer: You have to follow me.  I went from when she was questioning witnesses or if the D.A.'s questioning witnesses and she'll object to something, and you automatically override what she's saying like I don't care what you say, woman.  And I'm like whoa, this is my attorney.  This is supposed to be representing me.  But if Lippsmeyer makes the same objection, you'll go with what he says.  I don't understand what that is.
>
> But I don't know if it has something to do with when we had– you asked me a few months ago do I still want to have Ms. Repkow represent me when she was leaving her office.  I don't know if this has something to do with the hearings I wasn't present at, things I don't know.  So I think I'm being caught up in the

---

[14]  This confusion was justified in that the matter of Jail privileges withdrawal for a second time was an anticipated event at the time of the *in camera* hearing.  The actual second revocation, as discussed at length during the evidentiary hearing did not take place until June of 2001, several months after the *in camera* hearing.

1   middle of it, you know.
            So I feel that she has other things on her mind and that's probably not even
2   her fault that she's just like getting shut out of this little trial....

3   RT (<u>Marsden</u> Hearing) Exhibit 15 at 5080-5081.

4            Thus, petitioner indicated that there might have been something of which he was

5   unaware at the *in camera* hearing.  The trial judge queried Repkow about all the things she had

6   done in the case, and Repkow stated in a bottom line fashion that despite any outside problems,

7   she felt competent to represent petitioner.  <u>Id</u>. at 5086.

8            At evidentiary hearing, petitioner's habeas counsel on cross-examination focused

9   in quite a bit on Repkow's asserted competence at the first <u>Marsden</u> hearing.  The undersigned

10  will include samples of that cross-examination (mainly statements made at subsequent <u>Marsden</u>

11  hearings) for completeness.  However, petitioner's counsel emphasis on this asserted

12  impeachment appears to have been focused on his view of the prejudice standard – only a

13  disruption in the attorney-client relationship need be shown – a view which the undersigned

14  rejects <u>infra</u> for the one claim remaining in this petition.

15           At the July 2, 2001 proceedings (RT 6231) Repkow stated:

16  [referring to the then recently implemented cancellation of Repkow's pass through privileges]

17       Yeah, I think it's not just a logistical problem, you know, it's not just a matter of
         discomfort, you know, it's really beginning to go beyond that.  It's beginning to
18       interfere between Mr. Brewer and I because he doesn't know what's going on.  No
         one has informed him– or no one has informed me what's going on.
19

20  RT (Ev. Hrng.) 63; Exhibit 17, July 2 at 6233.[15]

21  _____

22       [15]But, Repkow continued to be equivocal about her ability to competently represent
    petitioner:
23

24       "I have indicated to Mr. Brewer, as I have to the Court, that despite the fact that
         there are things going on affecting my having left the Public Defender's office, et
         cetera, that I am competent to represent him, and I have indicated to Mr. Brewer
25       that I would continue to represent that to the Court as long as I felt that that was
         the case.  And I still feel that is the case.
26  Exhibit 22, August 14, 2001 at 8056.

40

Importantly, Repkow disclaimed knowledge of why her "pass through" had been revoked:

> The Court: So you have no information either?
> Ms. Repkow: I have none.

Exhibit 17, July 2 at 6233-34.

The next day, a jail captain informed the court that the pass through had been revoked because of Repkow's contraband passing. No mention was made of Repkow's relationship (such as it was) with an inmate. Exhibit 17, July 3 at 6241-42. Repkow continued to deny knowledge of any recent activity which would have warranted the June revocation of her pass through privileges. The court also made a "tentative" finding, ultimately made permanent, that although the revocation of the pass-through privileges made Repkow's representation of Brewer more difficult, it did not result in an inability of attorney-client communication. Id. At 6248. Repkow was unsatisfied, and asserted that rumors were floating about the Jail concerning herself, and that until she could understand all the reasons for her pass-through revocation, "[i]t's creating a conflict kind of situation between Mr. Brewer and I because he sits there and looks at me and wonders what it is I'm doing." Id. at 6250. Repkow did not believe that the present situation was related to the circumstances which existed at the "waiver hearing" at issue here, and that "any waiver that Mr. Brewer made months ago doesn't pertain to what's happening now." Id. at 6252.

Brewer continued to make Marsden motions throughout the remainder of July, but these were related to particular events at trial where Brewer continued to maintain that there had been previous "closed hearings" that "might have some bearing on the way she's representing me now." Exhibit 19, July 18, 2001 at 7038. At one point in August 2001, he asked for yet another Marsden hearing and related that he had not understood what the judge was saying when advised at the "waiver hearing" that he could be advised by independent counsel. RT, Exhibit 21, August 6 at 7820-21. It was at this time that Brewer stated that he had knowledge that his attorney may have had some type of illicit relationship with an inmate. Id. at 7822. He related that he became

1   aware of this through a newspaper article, id. at 7823, and that he had not been aware of this

2   when he waived any conflict at the "waiver hearing." Id at 7824.  Brewer stated that he was

3   being "harassed" by deputies because of this, and could not work with his attorney because of

4   this.

5           However, at the August 22 Marsden hearing, Brewer indicated that he might have

6   been aware of the romance "rumors" at the time of his "waiver hearing."

7           Well, it all goes back to when um– my attorney was leaving her office, either
            voluntarily or forcefully, whether she was going to be fired or not, I don't know.
8           *I have heard various rumors, but I felt up until that time I was being represented.*
            I felt that I was. But I am not sure now.....

9

10  Exhibit 22, August 14, 2001 at 8047.

11  Despite use of the present participle, the sense of the entire sentence is that petitioner Brewer had

12  been aware of the rumors at the time of the "waiver hearing."  Brewer went on to mention an

13  inappropriate incident where he saw his attorney making signals of a sort to the other inmate

14  outside the Jail facility.  A back and forth between the judge and petitioner ensued where the

15  judge indicated (again) that Repkow was doing a satisfactory job in court , and activities out of

16  court were not a concern to him.  Petitioner then focused in on the key factual issue here:

17          You know there were certain issues of why she was leaving her office that I
            wasn't present for during the hearings.  I just look at it this way.  You knew
18          because I remember when you asked me, you– the first time you ever would
            address me...I didn't know she had emotional ties, was all mixed up in willing to
19          leave her office behind not stopping ties with a certain individual.
            I didn't know all of this stuff.  I didn't know all of these circumstances.  Okay.
20

21  Exhibit 22, August 14, 2001 at 8052-53.

22          Also, petitioner Brewer's frustration with his very long trial was becoming

23  apparent.  "Everything goes together with this to the point where I want to waive my

24  appearance... *The jury's mind is made up."*  Exhibit 22, August 14 at 8050. (Emphasis added).

25          Brewer did testify at evidentiary hearing.  At the time of the waiver hearing,

26  Repkow had not told him of any romantic relationship with an inmate.  RT (Evid. Hearing) at

                                              42

161.  He had become aware of things gradually over time.  Id. at 164.  He did state that had he known of the romantic relationship, he would not have desired her as an attorney, id. at 174, due mainly to the fact that good attorneys should not act that way.  However, Brewer left the issue of what he knew at the "waiver hearing" in as ambiguous a state as when the evidentiary hearing started.  In response to the undersigned's question about whether he asked Repkow what had gone on at the hearing for which he was excluded, he stated:

> I mean that we had some conversations about it, and I believe that she had already been truthful with me.  *I already knew what was going on.*

RT (Evid. Hearing) at 197-198 (emphasis added).

What he already knew at the time of the *in camera* hearing, is, of course, the crux of the factual issue.

### *Factual Finding of Valid Waiver*

In order to resolve the issue of what petitioner knew and when he knew it, the undersigned balances the most important evidence on the subject: the Repkow evidentiary hearing testimony and the statements made by petitioner and Repkow at his various Marsden hearings; both sides have weight to their points.  The undersigned finds that the balance tips in Repkow's favor.

First, Repkow appeared credible when testifying.  She did not appear to be holding back or attempting to cover-up an embarrassing situation.  As the matter with the other inmate (Clark) is old news at this point, she did not have a present motivation to do so.  Nor does it appear that she had anything to gain, years after the facts, by testifying that her former client, petitioner, was aware of the Clark romantic, somewhat platonic given the circumstances, attachment.

Further, judging from the taped conversations between Repkow and inmate Clark recorded by Jail officials, which the court has reviewed, Repkow was not one, at the time of her found inappropriate actions, prone to keeping them from the view of anyone who cared to look,

nor did she appear especially embarrassed by them.[16]  To suppose that she nevertheless carefully hid these flaunted actions from her client prior to the *in camera* hearing, including the alleged romantic attachment with an inmate, appears very improbable.

Petitioner's counsel made much of the fact that Repkow was confused at evidentiary hearing as to the timing of the second revocation of pass-through privileges. [17] However, Repkow testified that the timing of the privileges cancellation had confused her as it came months after the fact of her relationship had been communicated by the Jail authorities to the Public Defender and months after it had been aired in court.  RT (Ev. Hrng.) 63.  This is believable as she began to think there was something else she was not aware of that had finally caused the cancellation.  RT (Ev. Hrng.) 63-73.  See also RT (Ev. Hrng.) 84-85, 93.  This testimony takes much of the force away from Repkow's statements at the Marsden hearings that neither she *nor her client*, had been informed of the reasons for the June memorandum taking away her pass-through privileges for the second time.

Moreover, petitioner Brewer was not a meek, mild client, afraid to confront his attorney when he thought something needed to be aired.  The Marsden motions' description of heated arguments on tactics and the like prove the point.  It becomes, therefore, unthinkable, that Brewer did not question his attorney about *everything* that transpired at the *in camera* session.  And it is improbable that Repkow's eager-to-show-the-world familiarity with criminal defendants was somehow absent when she was being questioned by petitioner.

The undersigned has recounted at length the Marsden hearings in which petitioner disclaimed knowledge about what had happened at the "secret" session, and later when he

---

[16]  It did not appear that Repkow took any meaningful precautions, even if she could, to somehow insulate her Clark phone conversations from Jail review.  And, she had to know that Jail phone conversations, except for bona fide attorney-client conversations, are monitored by Jail officials.  Certainly, these oftentimes steamy phone conversations were not part of any attorney-client confidential conversations.

[17]  Repkow initially believed at evidentiary hearing that the second pass-through take-away was contemporaneous with the April *in camera* hearing.

formally tied the romantic Clark attachment to his arguments to replace counsel.  *On their face*, and singularly considered, the statements could surely be interpreted as the newly discovered basis as to why Repkow's professional relationship with petitioner Brewer had become strained, and could be interpreted as something which would have been significant in his determination at the April hearing not to waive potential conflicts.  But viewing the evidence as a whole, the court finds that Brewer was initially (and reasonably) suspicious at the time of the <u>Marsden</u> motions that there was yet some other undisclosed topic, i.e, other than Repkow's relationship with Clark, discussed at the *in camera* hearing about which he knew nothing, and which he suspected was coloring the judge's attitude towards his attorney.

Later, Brewer utilized what he knew about the Repkow/Clark situation as a desperate measure to divert what must have seemed at the time an inevitable verdict of guilty. Brewer had been in trial for months at the time of his seriatim <u>Marsden</u> motions, must have been tired and frustrated by that time, and had been exposed to much evidence which would appear insurmountable to him.  His reasons for requesting the <u>Marsden</u> hearings: his attorney's objections were not looked upon with favor by the judge; his counsel was not vigorously attacking witnesses called against him, bespeak more of the frustration with the trial process than any legitimate need to get evidence of his meritorious defense before the jury which was not being pursued by his attorney.  The already known Repkow misconduct was being used as his only possible way to upset the trial process.

In sum, in light of the fact that petitioner had been in court when much of Repkow's problems were aired, the statements at various *in camera* hearings, *and* the evidence disclosed at evidentiary hearing, the undersigned finds that Brewer had sufficient knowledge *at the in camera hearing* of all of Repkow's problems such that the conflict waiver he made was intelligent, i.e., valid.

### Legal Finding of No Prejudice

But even if the undersigned has completely misinterpreted petitioner Brewer's

1    state of mind – and that petitioner did not know of Repkow's "inmate romance" problems and

2    was truly shocked and dismayed about new found, months after the *in camera* hearing

3    revelations, of his attorney's misconduct such that he no longer could work with her under the

4    conditions in the Jail – petitioner points to no cognizable prejudice from this ripened conflict.

5        "To show an actual conflict resulting in an adverse effect, [the petitioner] must
          demonstrate that some plausible alternative defense strategy or tactic might have
6         been pursued but was not and that the alternative defense was inherently in
          conflict with or not undertaken due to the attorney's other loyalties or interests."
7        *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir.2006) (quotations omitted).

8    Foote v. Del Papa 492 F.3d 1026, 1029-30 (9th Cir. 2007).

9    See also Campbell v. Rice, 408 F.3d 1166, 1170-71 (9th Cir.2005) (en banc) (holding that the

10   petitioner failed to show adverse effect because the trial tactics that counsel neglected to pursue

11   would not have succeeded).

12          Petitioner has completely eschewed any finding of prejudice arising from

13   counsel's performance before and during trial, i.e., what she did to prepare for or conduct trial.

14   That is, petitioner does not contend that a defense was not pursued or a witness not called, and

15   the like, which would undermine confidence in the verdict, or even adversely affect counsel's

16   performance in the trial.  Petitioner expressly conceded, and never retracted,  "that an adequate

17   showing of this type of 'adverse effect' cannot not be made in this case."  FAP, pp. 33-34.

18   Rather, petitioner relies solely on the plurality opinion in Bradley supra (510 F.3d 1093 (en

19   banc)) for the proposition that "the *Bradley* court, in reversing the judgment, found that prejudice

20   was determined by whether or not it led to a breakdown in the attorney-client relationship."

21   Traverse at 7.  "The issue here is the breakdown of the attorney-client relationship."  Traverse at

22   12.  Again, to the extent that petitioner relies on the Bradley, plurality opinion, that less than a

23   majority opinion does not overrule established circuit precedent to the contrary.  Bradley v.

24   Henry, 518 F.3d 518 (9th Cir. 2007).

25          While petitioner's breakdown-in-the- relationship standard would have

26   applicability if the issue here were unwarranted failure to substitute counsel in the summer of

1    2001, that claim ( the <u>Marsden</u> Claim No. 3) has been expressly abandoned.  Thus, the

2    undersigned need make no findings about whether the trial judge's continuous findings that the

3    attorney-client relationship had not broken down were AEDPA reasonable or not.[18]

4            Thus, even assuming an invalid waiver of a potential conflict which led to an

5    actual conflict, petitioner has failed to even assert the requisite prejudice, much less demonstrate

6    it. [19]

7            Nor does petitioner fare any better if the issue is viewed from the legal perspective

8    of his absence from a critical stage of the proceedings.  As set forth in the previously cited en

9    banc <u>Campbell</u> case, 408 F.3d 1166, 1172 (9th Cir. 2005), harmless error is applicable to an

10   unwarranted absence of a defendant from a critical stage of the proceedings, and harmlessness is

11   judged by the affect *on the trial.*

> Accordingly, there is no reasonable probability that obtaining replacement counsel
> would have changed the outcome of the guilt-phase proceedings, and Hovey's
> exclusion from the competency hearing was not prejudicial.

14   <u>Hovey v. Ayers</u>, 458 F.3d 892, 903 (9th Cir. 2006) (citing <u>Campbell</u>).

15   The <u>Hovey</u> case could not have been more on point for this prejudice issue.

16           The undersigned is not being critical of habeas counsel by finding that he

17   essentially abandoned the opportunity to show adverse effect on the verdict.  One can read the

18   facts in the appellate opinion in petitioner's case and understand why counsel did not attempt this

19   impossible task.

---

[18]  The undersigned does not contest here petitioner's point that the attorney-client relationship had deteriorated for whatever reason.  However, the most likely reason apparent to the undersigned for this deterioration was the prosecution juggernaut as opposed to the hassles involved in the loss of pass-through privileges.  But the undersigned's observation here is besides the point.

[19]  The undersigned could quote at length from the *in camera* transcripts demonstrating that during the <u>Marsden</u> motions, the trial judge inquired time and again how the difficulties with the pass-through and communications in general were affecting the performance of trial counsel.  Time and again, no adverse effect could be articulated, and often, trial counsel would affirm that she was competently representing petitioner.  The undersigned will not waste further space documenting these facts given petitioner's concession that he cannot show adverse performance.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED that the habeas petition, reduced to one claim with two facets, should be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 08/16/2010

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

brewer0382.157

48